[Civ. No. 13409. Third Dist. Mar. 21, 1973.]

WIECHMANN ENGINEERS, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA ex rel. DEPARTMENT OF
PUBLIC WORKS, Defendant and Respondent.

742

## COUNSEL

Williams, Van Hoesen & Brigham, David Van Hoesen and Dennis P. Mankin for Plaintiff and Appellant.

Harry S. Fenton, Kingsley T. Hoegstedt, Orrin F. Finch, John R. Bell and Ralph E. Livingston, Jr., for Defendant and Respondent.

## OPINION

**CARTER, J.**\*—Plaintiff appeals from a judgment in favor of the State of California following a court trial. This action arose out of a contract between plaintiff corporation and the State of California for the clearing, excavation and grading of approximately 10 miles of road in Modoc County. Plaintiff claims it is not liable for liquidated damages, and that it is entitled to recover additional money for work performed and damages for breach of contract by reason of defendant's fraudulent concealment.

We find the appeal to be without merit and will accordingly affirm the judgment of the trial court.

On February 14, 1964, defendant State of California published a notice

---

\*Assigned by the Chairman of the Judicial Council.

to contractors calling for bids for road construction work in Modoc County. The work to be performed generally involved the grading and surfacing with aggregate base of approximately nine and a half miles of county road. The notice provided sealed bids would be received by the state until 2 p.m. on March 18, 1964. Plaintiff received a bid package from the state which incorporated by reference Standard Specifications—January 1960, a thick document containing contractual provisions applicable to all projects bid for the Division of Highways. The bid package also included Special Provisions, detailed diagrams and materials information. The road, except for the most northerly end, was to follow an existing unimproved road generally referred to as the Lookout-Hackamore Road. After obtaining the bid information, plaintiff's vice-president and general manager, James Barkley, visited the proposed job site on two successive weekends prior to the submission of plaintiff's bid. During these pre-bid inspections Barkley admitted he traversed the roadway, it was clear of snow, and he noticed boulders in and along the road construction site.

Thereafter, Barkley telephoned the highway district office in Redding and inquired as to the nature of a borrow pit located about 10 miles from the job site. Barkley was a graduate mining engineer with considerable road construction experience. He conceded that since the project necessarily involved cuts and fills, he assumed that subsoil tests had been made in order to design the road project. Thereafter, without making any inquiry as to either the existence, nature or contents of such possible subsurface tests, Barkley proceeded to prepare the bid. An itemized bid was required with such items as clearing and grubbing, developing a water supply and finishing the roadway calling for lump sum amounts. Other items such as cubic yards of roadway excavation, aggregate sub-base and various other items called for a unit price with a stated estimate of quantity. Plaintiff's bid was admittedly unbalanced in the sense that certain items were deliberately bid below cost. Prior to the bid submission, Barkley conferred with Mr. Wiechmann, president of plaintiff corporation, as a result of which a $15,000 reduction of Barkley's calculations was made to insure that plaintiff would be the low bidder. Plaintiff was awarded the contract with a low bid of $333,156. The next lowest bids were $361,841 and $374,800.25, respectively. The award date was April 14, 1964, with an original completion date of September 2, 1964, an allowance of 100 working days from the authorized date of commencement to completion.

By November 6, 1964, plaintiff had been given an extension of 24

working days, and on this date was granted a winter suspension of performance until May 17, 1965. Plaintiff overran the allowed contract time by 157 days, and pursuant to section 4 of the contract's Special Provisions, was assessed liquidated damages at the rate of $175 per calendar day in the total sum of $27,475, which was withheld from final payment by the state.

Subsequent to completion of the job, plaintiff filed a claim for $435,-298.63 for additional costs due to alleged latent conditions, namely, subsurface boulders uncovered along the length of the project, and for release of the retained assessment for liquidated damages. After a hearing by the board of review, the claims were denied by the state engineer and thereafter rejected by the State Board of Control. On August 3, 1967, plaintiff instituted the action now before this court.

In 1962 and 1963, prior to the call for bids, the state caused to be drilled 18 test holes along the roadway. The reports disclosed the presence of subsurface boulders at various stations. Thirteen of the 18 tests contained such comments as, "generally boulderous," "area is very boulderous," and "hole stopped on nested boulders." This information was not in the bid package given to the prospective bidders. The reports were on file in the office of the district engineer in Redding.

Section 5-105 of the Special Provisions of the contract provides in part: "The bidder shall examine carefully the site of the work contemplated, the plans and specifications, and the proposal and contract forms therefor. The submission of a bid shall be conclusive evidence that the bidder has investigated and is satisfied as to the conditions to be encountered, as to the character, quality, and quantities of work to be performed and materials to be furnished, and as to the requirements of the proposal, plans, specifications, and the contract.

"Where the Department has made investigations of subsurface conditions in areas where work is to be performed under the contract, or in other areas, some of which may constitute possible local materials sources, such investigations are made only for the purpose of study and design. Where such investigations have been made, bidders or Contractors may, upon written request, inspect the records of the Department as to such investigations subject to and upon the conditions hereinafter set forth. Such inspection of records may be made at the office of the district in which the work is situated . . . ."

"The records of such investigations are not a part of the contract and

are shown solely for the convenience of the bidder or Contractor. It is expressly understood and agreed that the Department assumes no responsibility whatsoever in respect to the sufficiency or accuracy of the investigations thus made, the records thereof, or of the interpretation set forth therein or made by the Department in its use thereof and there is no warranty or guaranty, either express or implied, that the conditions indicated by such investigations or records thereof are representative of those existing throughout such areas, or any part thereof, or that unlooked for developments may not occur, or that materials other than, or in proportions different from those indicated, may not be encountered.

"When a log of test borings showing a record of the data obtained by the Department's investigation of subsurface conditions is included with the contract plans, it is expressly understood and agreed that said log of test borings does not constitute a part of the contract, represents only the opinion of the Department as to the character of the materials encountered by it in its test borings, is included in the plans only for the convenience of bidders and its use is subject to all of the conditions and limitations set forth in the provisions in this section.

"In some instances, the information from such subsurface investigations considered by the Department to be of possible interest to bidders or Contractors has been compiled as 'Materials Information.' Said 'Materials Information' is not a part of the contract and is furnished solely for the convenience of bidders or Contractors. It is understood and agreed that the fact that the Department has compiled the information from such investigations as 'Materials Information' and has exhibited or furnished to the bidders or Contractors such 'Materials Information' shall not be construed as a warranty or guaranty, express or implied, as to the completeness or accuracy of such compilations and the use of such 'Materials Information' shall be subject to all of the conditions and limitations set forth in this section and Section, 'Materials', of these special provisions."

As previously noted, plaintiff's vice-president, Mr. Barkley, telephoned the district office in Redding to inquire about the nature of the borrow pit referred to in the materials information report given to prospective bidders. The borrow pit was snowed in at the time and impossible to reach. Barkley did not inquire about the results of any subsurface test that may have been made, although he assumed the state had that information when the cuts and fills were designed, and he knew further that if there were reports on the subsurface conditions, they could be inspected at the district office in Redding. Barkley agreed at the trial that it would

have been reasonable to have made an inquiry as to subsurface tests in light of the fact that he could see boulders in and along the roadway area; he was aware of volcanic activity in the area; the presence of snow prevented a clear view of the area surrounding the project, and he had not made any subsurface investigation himself.

When plaintiff commenced excavation work it uncovered larger boulders than contemplated. Plaintiff's scraping equipment could not readily move boulders of that size, and it was necessary for the plaintiff to purchase or rent heavier equipment including a front-end loader and rock type trucks. In addition, it was Barkley's opinion that many of the boulders were too large to be used in the fill portions of the road because they would have extended above the grade level. Some of the boulders were blasted but most were hauled away and borrow material from an outside source was brought in to replace areas where the boulders could not be used as fill.

As noted, plaintiff presented two claims before the board of review, one for increased cost due to latent conditions (the boulders), and the second for release of the retained assessment for liquidated damages, on the theory that the job time overrun was caused by the boulders. As previously noted, the state engineer denied both claims. Section 9-1.07 of the Standard Specifications provided that the state's engineer shall make a determination regarding a contractor's claims, and that upon determining those claims, the engineer shall make his final estimate of sums due under the contract, which estimate "shall be conclusive and binding . . . on all questions relating to the amount of work done and the compensation payable therefor . . . ."

## I.  State Engineer's Denial of Claim

This court discussed the finality of the state engineer's decision under section 9-1.07 of the Standard Specifications in *People* ex rel. *Dept. Pub. Wks.* v. *McNamara Corp. Ltd.* (1972) 28 Cal.App.3d 641 [104 Cal.Rptr. 822], and concluded that the state's public works contracts carry an implied covenant of fair dealing and the state may not by language in the contract impart finality to administrative decisions characterized by fraud or gross error.

"The boundaries of the phrase 'gross error' fix the degree of finality accorded the enginer's [*sic*] administrative decision and correlatively estab-

lish the scope of judicial review. To require dishonesty or bad faith as indispensable elements stamps the decision with more finality and constricts judicial review more narrowly than the phrase permits. Both *Teichert* and *Macomber* include arbitrariness within the connotation of gross error.

"The engineer's decision may entail interpretation of the contract language or specifications; application of a rule of law, or of a contract interpretation, to agreed facts; or a resolution of disputed facts. Whatever his honesty, any of these decisions may be so groundless that no impartial, *reasoning* arbiter would agree with it. An action is arbitrary when it is based on no more than the will or desire of the decision-maker and not supported by a fair or substantial reason [citations]. In the context of fact-finding, arbitrariness characterizes the decision when it lacks substantial support in the evidence. [Citations.] Fraud or bad faith, as morally reprehensible qualities, are not necessary attributes of arbitrariness, hence are not indispensable ingredients of gross error." (*Clack* v. *State of California* ex rel. *Dept. Pub. Wks.* (1969) 275 Cal.App.2d 743, 746-747 [80 Cal.Rptr. 274].) (Original italics.)

In *McNamara* the trial court entered summary judgment for the state. We reversed and remanded the cause for trial on the merits. The trial court should not make an independent, de novo determination, for this would deprive the administrative settlement of the degree of finality accorded it by the contracting parties; however, the court must examine the evidence to determine whether the state engineer's decision was arbitrary. The trial court in the case before us took extensive evidence and found "[t]hat the State Highway Engineer's determination denying plaintiff's claim was supported by substantial evidence and was not the result of fraud, bad faith, gross error, or arbitrariness." We, in turn, have reviewed the record and find substantial evidence to support the judgment of the trial court. (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].)

## II.   *Liability for Fraudulent Concealment*

■■■  Plaintiff urges there was an affirmative duty on the part of the state to refer specifically to the existence of the subsurface tests or to attach a copy of the test results as a part of the bid package and that failure to do so was fraudulent concealment, this on the premise that since subsurface tests had been made which disclosed boulderous conditions, such information was naturally of interest to bidders. We note an onsite

inspection made the same disclosure. No specific reference to the test borings was required to apprise the bidder of the reasonable probability that larger or more numerous boulders than appeared on the surface might be found.

■ Generally, fraudulent concealment gives rise to an action in tort; however, such an action for misrepresentation against public agencies is barred by Government Code section 818.8. This section provides in part: "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."

In *E. H. Morrill Co.* v. *State of California* (1967) 65 Cal.2d 787, 793-794 [56 Cal.Rptr. 479, 423 P.2d 551], the Supreme Court held that while section 818.8 barred a tort action for deceit against a public entity, an action in contract .for breach of warranty is proper in view of the language of section 814 of the Government Code. Thus, a public entity may be liable for a misrepresentation which constitutes such a breach of contract as to make the contractor unable to perform according to the contract provisions, or may be liable for furnishing misleading plans and specifications under the concept of a breach of an implied warranty of the correctness. (See *City of Salinas* v. *Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 222 [57 Cal.Rptr. 337, 424 P.2d 921].)

The California Supreme Court recently discussed fraudulent concealment in *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 294 [85 Cal.Rptr. 444, 466 P.2d 996]: " 'It is the general rule that by failing to impart its knowledge of difficulties to be encountered in a project, the owner will be liable for misrepresentation if the contractor is unable to perform according to the contract provisions.' [Citations.] As explained in *Souza & McCue Construction Co.* v. *Superior Court* (1962) 57 Cal.2d 508, 510-511 [20 Cal.Rptr. 634, 370 P.2d 338]: 'This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness. . . .' [Citations.]"

■ Here, the trial court made detailed findings (V through XXV) which essentially negated plaintiff's contentions that it was misled, subject to fraud, bad faith, gross error or arbitrariness. The lower court specifically found: "That defendant, neither in the plans, specifications, maps, or drawings furnished plaintiff, nor in any other manner, made any representation as to subsurface conditions that might be encountered at the project site or as to the nature of the material to be excavated." (Finding IX.)

"That defendant misrepresented no fact concerning subsurface conditions, either by an affirmative representation or nondisclosure, and breached no duty owed by it to plaintiff." (Finding XXIV.)

"That plaintiff's Vice President, Mr. James Barkley, made two pre-bid inspections of the project site and observed numerous partially exposed boulders in the existing roadway, and based upon his observation of these boulders, made a judgment as to their size, the means by which they could be excavated, and an estimate of the cost of such excavation." (Finding XIII.)

Although the state engineer was not presented with the reports of tests on the subsurface soils which had been done in 1962 and 1963, the trial court was of the opinion that knowledge of those reports would have made no difference to the state engineer's decision.

We have set out the trial court's findings in some detail because there is virtually no conflict in the evidence supporting them. The conclusions of law are clear. There was no partial disclosure, no half-truths which purported to be the whole truth or which were likely to mislead. The sum total of all the facts known or to be known about the project were readily discoverable by plaintiff; they were not known and accessible only to the state. There was no active or passive concealment of facts.

This court observed in *A. Teichert & Son, Inc.* v. *State of Cal.* (1965) 238 Cal.App.2d 736, 755 [48 Cal.Rptr. 225]: "If the contracting agency furnishes inaccurate project information, such as soil reports, *as a basis for bids,* it may be liable for damages on a breach of warranty theory. (*Souza & McCue Constr. Co.* v. *Superior Court, supra,* 57 Cal.2d at pp. 510-511; *Gogo* v. *Los Angeles County Flood Control Dist., supra,* 45 Cal.App.2d at p. 338 [114 P.2d 65].) If the agency makes geological data available under a disclaimer of responsibility, the contractor bears any loss occasioned by unexpected conditions. (*Thomas Kelly & Sons, Inc.* v. *City of Los Angeles,* 6 Cal.App.2d 539, 542-543 [45 P.2d 223]; *Rocell Constr. Co.* v. *State,* 208 Misc. 364 [141 N.Y.Supp.2d 463].) The contracting agency's disclaimer does not protect it from liability for deliberate misrepresentation or concealment. (*United States* v. *Spearin,* 248 U.S. 132, 136-137 [63 L.Ed. 166, 39 S.Ct. 59]; *Jackson* v. *State,* 210 App. Div. 115 [205 N.Y.Supp. 658], affd. 241 N.Y. 563 [150 N.E. 556].)" (Original italics.)

The case of *City of Salinas* v. *Souza & McCue Construction Co., supra,* 66 Cal.2d 217, represents one of the frequent applications of the rule

stated in *Kimball* v. *Pacific Gas & Electric Co.* (1934) 220 Cal. 203, 219 [30 P.2d 39], where the court made reference to the "elementary principle" of fraudulent concealment. Plaintiff's reliance on *City of Salinas* is misplaced. In that case the city's chief engineer in charge of the project not only knew of the highly unstable conditions existing in the subsoil along the proposed construction line; that particularly difficult conditions were likely to be encountered in an extensive slough area, but had directed an independent testing firm to make testings at preselected spacings and locations which avoided the area of greatest unsettled conditions; that the method of taking the tests was misleading; that these boring tests were sent to bidders only a few days before the opening of bids, and while it would have been proper practice to warn bidders of anticipated difficult conditions, the city officials did not do so.

As previously noted, in the case at bench there is no evidence of a deliberate or calculated attempt by the state to create false or misleading information as to subsurface conditions; secondly, no false or misleading information respecting the subsoil was placed in the hands of prospective bidders which it reasonably might be expected they would rely on or use in the preparation of their bid; third, this is not a case in which it reasonably can be contended the state had a duty to warn prospective bidders of boulderous conditions, since the hazard and risk of such a condition was readily apparent as the result of an onsite inspection.

Courts uniformly distinguish between the misleading half-truth, or partial disclosure, and the case in which defendant says nothing at all. The general rule is that silence alone is not actionable. The cases establishing this rule are discussed in *Scafidi* v. *Western Loan & Bldg. Co.* (1946) 72 Cal.App.2d 550, 563 [165 P.2d 260].

Plaintiff forcefully urges the applicability of *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285 [85 Cal.Rptr. 444, 466 P.2d 996], a case involving the installation of reinforced concrete pilings in drill holes in sandy unstable soil. The City of Los Angeles had dug two test holes prior to calling for bids and furnished a log as summary of the test hole findings to all bidders. This information erroneously reported the nature of the material to be encountered by the contractor and further the city failed to inform bidders that caveins had occurred during the drilling requiring special drilling techniques. In affirming a verdict against the city, the court stated (at p. 294): "In transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant

makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." (Fns. omitted.)

We conclude that *Warner* is distinguishable for several reasons. Here, there was no representation of any kind as to subsurface conditions. Absent such a representation, there was no disclosed fact which was likely to mislead plaintiff.

Secondly, knowledge of the boulderous condition was not known or accessible only to the state, nor did the state have such facts as were not known or reasonably discoverable by plaintiff, if plaintiff had made what would have been admittedly a reasonable and prudent inquiry.

As previously pointed out, section 5-1.05 of the Special Provisions of the contract provided in part: "Where such investigations [of subsurface conditions in areas where work is to be performed] have been made, bidders or Contractors may, upon written request, inspect the records of the Department as to such investigations . . . ."

Nothing in this language in any way limited accessibility or precluded plaintiff from obtaining all information available if it desired to inquire. Thus, there was no concealment of the boulderous condition on the job site or the test hole surveys. The record clearly shows actual visibility of boulders in the job area, a fact readily apparent and *known* to plaintiff *before* the bid was submitted, as evidenced by Barkley's detailed testimony.

Finally, Barkley, the very person entrusted with the responsibility to investigate and prepare the contractor's bid, not only assumed the state had test information as to the road subsurface, but testified he simply decided not to inquire about the same, fully mindful of the fact that the movement of rocks and boulders necessarily would be involved in the performance of the contract. We observe that had plaintiff elected to examine the available test hole surveys, it merely would have confirmed what onsite observations disclosed; namely, that the work of construction was to be undertaken in a boulderous area and the degree and nature of the condition would be something to consider when submitting a bid. Plaintiff elected to make its decision in this regard based on its own expertise in performing the work and its own judgment that further inquiry as to subsoil conditions was not required.

■ A public entity is not liable for an imprudent or careless investigation on the part of a contractor. Nor can a public entity invade the contractor's judgment arena and actively assist in the evaluation process undertaken by competitive bidders for public projects. It must treat all bidders alike and with equal fairness.

We hold there was no misrepresentation of factual matters within the state's knowledge or concealment of material information.

A careless contractor cannot convert his own lack of diligence into a case of fraudulent concealment against a public entity. As said in *Wunderlich* v. *State of California* (1967) 65 Cal.2d 777, 785 [56 Cal.Rptr. 473, 423 P.2d 545]: " 'All the information the State had concerning the soil conditions was available to claimant and claimant had been invited to make an investigation of its own. Under these circumstances, the State is not chargeable for claimant's loss. . . .' "

The State of California is not the guardian of every contractor who seeks to perform services for the public and at public expense. Such a concept would be grossly unfair to the prudent and careful contractor who is frequently underbid by a careless competitor. A contractor who submits a bid for public work which proves unprofitable because of his negligence in failing to ascertain all the facts concerning it from sources readily available, cannot thereafter throw the burden of his negligence upon the shoulders of the state by asserting that the latter was guilty of fraudulent concealment in not furnishing him with information which he made no effort to secure for himself. This is particularly true when the careless contractor is possessed of the kind of knowledge which would concededly prompt a prudent bidder to make further inquiry.

### III. *Liquidated Damages*

■ Finally, there is no merit to plaintiff's contention that "defendant having failed to present any evidence justifying its claim of liquidated damages, plaintiff is entitled to judgment" "to recover $27,475.00 which was the amount assessed by defendant as liquidated damages." Section 4 of the Special Provisions of the contract provides: "The Contractor shall pay to the State of California the sum of $175 per day, for each and every calendar day's delay in finishing the work in excess of the number of working days prescribed above." Completion of the work consumed 157 calendar days beyond the 100 days specified in the contract. Liquidated damages for 157 days at the agreed rate of $175 per day amounts to $27,475. There is no dispute as to these facts.

Section 14376 of the Government Code and *Silva & Hill Constr. Co.* v. *Employers Mut. Liab. Ins. Co.* (1971) 19 Cal.App.3d 914, 918 [97 Cal. Rptr. 498], interpreting it, state the applicable law: "Section 14376 of the Government Code provides in pertinent part that 'Every [state] contract *shall* contain a provision in regard to the time when the whole or any specified portion of the work contemplated shall be completed, and shall provide that for each day completion is delayed beyond the specified time, the contractor shall forfeit and pay to the State a specified sum of money, to be deducted from any payments due or to become due to the contractor.' (Italics added.)

"Section 14376 is an integral part of a comprehensive statutory scheme governing the erection, construction, repair and improvement by the state of its buildings, roads and other structures. The statute represents an express legislative effort to protect the State of California from the consequences of delay in the completion of state construction projects. As such, section 14376 serves to protect the state in two ways. First, it insures that the state will be at least partially reimbursed for additional costs, lost public benefits, overhead expenses, etc., incurred as a result of the contractor's overrun. Secondly, it encourages the contractor to work towards a timely completion of the work."

Judgment is affirmed.

Richardson, P. J., and Regan, J., concurred.