[Civ. No. 41646. First Dist., Div. Four. Mar. 27, 1979.]

JASPER CONSTRUCTION, INC., Plaintiff and Appellant, v.
FOOTHILL JUNIOR COLLEGE DISTRICT OF SANTA CLARA
COUNTY, Defendant and Appellant.

**COUNSEL**

Gerald R. Knecht for Plaintiff and Appellant.

Cottrell, Hofvendahl & Roessler, Russell L. Hofvendahl and Robert A. Seligson for Defendant and Appellant.

**OPINION**

**DRUMMOND, J.\***—Defendant-appellant Foothill Junior College District of Santa Clara County (hereafter Foothill) appeals from a judgment in Santa Clara County Superior Court following a jury verdict awarding plaintiff-respondent Jasper Construction Company (hereafter Jasper) $742,133.96 upon its complaint for damages for breach of contract stemming from alleged defects in plans and specifications for the construction of a junior college auditorium.

Jasper cross-appeals from that portion of the judgment denying it prejudgment interest.

The focus of controversy in this case is the construction of the Calvin C. Flint Center for the Performing Arts, located on the De Anza Community

---

*Assigned by the Chairperson of the Judicial Council.

College campus in Santa Clara. Jasper[1] was the general contractor for this project and Foothill the owner for whom the project was constructed. In addition to suing Foothill, Jasper sued Kump, Masten & Hurd, a joint venture consisting of two separate architectural firms (hereafter referred to as the architects) who designed and supervised the project. The essence of Jasper's claim was that as the result of inadequate and defective plans and specifications for the construction of the project and negligence in administering it, Jasper suffered delays and extra expenses for which he sought recovery in damages.

Under the terms of the contract signed on May 17, 1968, Jasper was to be paid $3,307,403 and was required to complete the project within 600 calendar days or by January 7, 1970. Jasper agreed to pay as liquidated damages, the sum of $400 for each calendar day that the project was delayed.

Jasper received extensions of 155 days from Foothill, which would have made the completion date June 11, 1970. Requests totalling 223 days of extension were denied. Notice of completion was not in fact filed until June 10, 1971, or 363 days beyond the original completion date. Foothill thus withheld $145,200 in liquidated damages on account of the delay.

Jasper's major claim for damages at trial was that the plans and specifications prepared by the architects were defective since they did not reveal that he was required to pour concrete by using a different method than the customary one he had anticipated when preparing his bid. The contract between the parties specified:

"11. CONSTRUCTION JOINTS

(A) Location and details of construction joints shall be as indicated on the structural drawings, or as approved by the Architect. Relate required vertical joints in walls to joints in finish. In general, approved joints shall be located to least impair the strength of the structure." Jasper stated that the location of the construction joints was not shown on the architect's drawings, but that certain structural drawings indicated to him that the steel was from floor-to-floor and that therefore the concrete would be poured from floor-to-floor. He stated that he began pouring the

---

[1] Jasper Construction Company was managed by Werner Jasper. For purposes of simplicity the term Jasper will be used interchangeably to denote both the corporation and the individual.

basement from floor-to-floor but that the architects then informed him to keep the pour joints in a straight horizontal line from wall-to-wall. Jasper objected to this "horizontal" method of pouring as he alleged that it left him with a lot of wooden concrete forms he could not use. At trial, Jasper claimed that having to use this different method of pouring cost him $500,000 in "extra material and extra labor," as distinguished from delay.

Foothill, in addition to denying liability under Jasper's claim, instituted a cross-complaint praying for $145,200 against Jasper as the result of his alleged breach of contract in delaying completion of the project. The figure was based on the $400 per day liquidated damage figure multiplied by the 363 additional days it took to complete the project.

The case went to the jury on theories of breach of implied warranty and breach of contract against Foothill and professional malpractice against the architects. The jury was instructed that if Foothill was responsible for some delay in completing the project, it could not recover under the liquidated damages provision, but could recover any actual damages for delays caused by Jasper.

The jury returned a general verdict in favor of Jasper and against Foothill in the sum of $742,133.96. It rendered a verdict in favor of Foothill on its cross-complaint against Jasper in the sum of $12,054.30. The jury found against the architects in the sum of $25,200 ($36,000 reduced by 30 percent, the proportion of contributory negligence of Jasper). The architects do not appeal. We discuss some of the major assignments of error.

*Implied Warranty Instructions*

At the request of Jasper, the trial court instructed the jury as follows: "When a public entity, such as Defendant Foothill District in this case, issues plans and specifications to a contractor, such as Plaintiff Jasper in this case, the District impliedly warrants that the plans and specifications are free from defect, are complete and will, if followed by the contractor, result in construction of the project intended." Foothill contends that this instruction constituted prejudicial error because it (1) permitted the jury to find Foothill liable in the absence of any evidence of misrepresentation or intentional concealment, contrary to law and (2) held Foothill strictly liable for the errors and omissions of the architects, even though the architects were independent contractors and were

themselves held only to a standard of ordinary negligence. The first of these contentions has merit.

 The correct rule applicable to the instant case was stated by the Supreme Court in *Souza & McCue Constr. Co.* v. *Superior Court* (1962) 57 Cal.2d 508, 510 [20 Cal.Rptr. 634, 370 P.2d 338]: "A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented. (E.g., *United States* v. *Spearin*, 248 U.S. 132, 136-137 [39 S.Ct. 59, 63 L.Ed. 166]; *Christie* v. *United States*, 237 U.S. 234, 239-242 [35 S.Ct. 565, 59 L.Ed. 933]; *McCree & Co.* v. *State*, 253 Minn. 295 [91 N.W.2d 713, 721-722]; see *Gogo* v. *Los Angeles etc. Flood Control Dist.*, 45 Cal.App.2d 334, 341 [114 P.2d 65]; 43 Am.Jur. 852; Annotation 76 A.L.R. 268.)" The Supreme Court went on to explain that "[t]his rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of implied warranty of their correctness." (*Id.*, at pp. 510-511.)

The "implied warranty" theory may be traced back to the early United States Supreme Court case of *United States* v. *Spearin* (1918) 248 U.S. 132 [63 L.Ed. 166, 39 S.Ct. 59]. Spearin, a contractor, agreed to build a dry dock for the federal government according to plans and specifications provided by the government. (*Id.*, at p. 133 [63 L.Ed. at p. 168].) Included within the plans was the relocation of a six-foot sewer. Spearin built the entire project as prescribed by the plans. About a year later the relocated sewer broke as the result of internal pressure brought about by heavy rain and the dry dock flooded. Upon investigation, it was discovered that there was a dam in a connecting sewer which had been diverting water to the six-foot sewer and causing the internal pressure. Although the government did not know of the dam, it did know that the sewers had overflowed from time to time and did not communicate this fact to Spearin. (*Id.*, at p. 134 [63 L.Ed. at p. 168].) It was held that Spearin should be allowed to recover damages for breach of contract. Said the court: "The risk of the existing system proving adequate might have rested upon Spearin, if the contract for the dry-dock had not contained the provision for relocation of the 6-foot sewer. But the insertion of the articles prescribing the character, dimensions and

location of the sewer imported a warranty that, if the specifications were complied with, the sewer would be adequate."

The first California case which squarely met with the issue was *Gogo* v. *L.A. etc. Flood Control Dist.* (1941) 45 Cal.App.2d 334 [114 P.2d 65], where a contractor was permitted to recover damages for extra excavation work done as the result of misrepresentations in plans furnished by the district. The applicable principles were clearly explained by the court:

"It may be stated generally that where the plans and specifications induce a public contractor reasonably to believe that certain indicated conditions actually exist and may be relied upon in submitting a bid, he is entitled to recover the value of such extra work as was necessitated by the conditions being *other than as represented.* (*Faber* v. *City of New York,* 222 N.Y. 255 [118 N.E. 609]; *Pitt Construction Co.* v. *City of Alliance,* 12 Fed. (2d) 28 (Ohio); *Hollerbach* v. *United States,* 233 U.S. 165 [34 Sup.Ct. 553, 58 L.Ed. 898]; *Salt Lake City* v. *Smith,* 104 Fed. 457 [43 C.C.A. 637] (Utah); *Palmberg* v. *City of Astoria, supra.*) The facts of the instant case bring it within the foregoing rule."

"The authorities are divided concerning the theory upon which recovery is allowed in this type of case. Some cases, such as *Faber* v. *City of New York, supra,* permit the contractor to recover on the theory of breach of contract because he was compelled to perform work not contemplated by the contract. However, the correct basis of recovery is on the theory that the action is one to recover damages for the *misrepresentation* by which the contract was induced. (*Hollerbach* v. *United States, supra; Mancy* v. *Oklahoma City, supra,* and *Pitt Construction Co.* v. *City of Alliance, supra.*) It would be inequitable to permit defendant to enforce the literal terms of the contract which called for the excavation of "all materials" necessary to complete the job when plaintiffs were induced by defendant's misrepresentation to submit a bid which was much lower than was warranted by the true facts." (*Id.,* at p. 341, italics added.)

In *Souza, supra,* a contractor alleged that the city's plans and specifications falsely represented that soil conditions at the construction site were stable, inducing him to make a lower bid on the project than he otherwise would have made. The California Supreme Court, relying on both *Spearin* and *Gogo* held that the complaint stated a valid cause of action and formulated the rule quoted above.

Subsequent cases make it clear that there must be an affirmative misrepresentation or concealment of material facts in the plans and specifications in order for the contractor to recover; the rule was not intended to burden public entities with liability where the contractor underbids due to lack of diligence in examining specifications and plans which are themselves accurate. Thus, in *Wunderlich* v. *State of California* (1967) 65 Cal.2d 777 [56 Cal.Rptr. 473, 423 P.2d 545], the Supreme Court denied recovery to a contractor on a breach of warranty theory where there was no positive misrepresentation or concealment of fact and the state had disclaimed any guarantee of the accuracy of its interpretation of the tests it had conducted. The court commented: "It is obvious that a governmental agency should not be put in the position of encouraging careless bidding by contractors who might anticipate that should conditions differ from optimistic expectations reflected in the bidding, the government will bear the costs of the bidder's error." (*Id.,* at p. 786.) In even stronger language, the Court of Appeal rejected a contractor's contention that the state was liable for failing to direct the bidders' attention to test results disclosing boulderous subsurface conditions, where an onsite inspection would have made the same disclosure, and the state possessed no superior knowledge. (*Wiechmann Engineers* v. *State of California* ex rel. *Dept. Pub. Works* (1973) 31 Cal.App.3d 741, 751 [107 Cal.Rptr. 529].)

The federal case of *Robert E. McKee, Inc.* v. *City of Atlanta* (N.D.Ga. 1976) 414 F.Supp. 957 also sheds valuable light on this point:

"The Supreme Court held long ago, in a series of cases relating to government contracts, that the government is liable to the contractor when it makes *positive statements of material facts* concerning the nature of the work in question, when those facts are false, *Hollerbach* v. *United States,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914), *Christie* v. *United States,* 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915), *United States* v. *Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

" . . . . . . . . . . . . . . . . .

[3-5] "Of course, the government does not become an insurer merely by providing certain information. State courts, in applying the principles enunciated above, have imposed two implied conditions on a claim for recovery for misinformation. The first requirement is that the bidder is not reasonably able to discover the true facts for himself.

" . . . . . . . . . . . . . . . . . .

"The second condition placed on a claim for recovery for misrepresentation is the materiality of misrepresentation itself. Recovery cannot be had for a contractor's own misjudgment based on information which itself is accurate. Thus, where the government undertakes a series of borings which are accurate, but which seem to indicate that there is less rock in this subsoil than actually exists, the contractor cannot recover for the cost of removing the extra rock, *McNulty, Inc.* v. *Village of Newport,* 290 Minn. 117, 187 N.W.2d 616 (1971). (*Id.,* at pp. 959-960; italics added.)"

The instructions given to the jury in the present case informed them neither that the contractor had to be misled, nor that he had to reasonably rely upon representations given in the plans or specifications for the project. Instead, the trial court told them that Foothill had impliedly warranted to Jasper that "the plans and specifications are *free from defect,* are *complete* and will, if followed by the contractor, result in construction of the project intended." (Italics added.) They were then simply told: "If you find there was a breach of implied warranty . . . then Jasper has a right of recovery against [Foothill] for all damages proximately caused by such breach." As can be seen from the foregoing authorities, there can be no liability of a public entity for extra work caused by plans and specifications that are merely "incomplete." Furthermore, recovery on this theory cannot be maintained upon a showing of a "defect" unless that defect consists of intentional concealment or positive assertions of material facts which prove to be false or misleading.

The potentially devastating effect on the jury resulting from the court's erroneous implied warranty instructions with respect to Jasper's concrete claim is apparent: The contract between the parties stated that "[l]ocation and details of construction joints shall be as indicated on the structural drawings or as approved by the Architect." Jasper conceded in his testimony that the joints were not shown on the drawings, but that he interpreted them to indicate that concrete pouring would be floor-to-floor. The contract nonetheless gave the architect complete authority to "decide the meaning and intent of any portion of the specifications and of any plans or drawings where the same may be found obscure or in dispute." There was expert testimony that either showing construction joints or not showing them in the plans was acceptable in the architectural profession, that a contractor who is unsure of the location of the joints

is required to ask the architect, and that an appropriate bid could be formulated from the contract documents.

An instruction that Foothill had warranted the *"completeness"* of the plans and specifications for the auditorium, permitted the jury to conclude that the mere failure of the plans to specify the location of joints or the method of concrete pouring, constituted an actionable wrong for which Jasper could recover damages. In other words, under the instructions Foothill could be held subject to liability for breach of warranty even though (a) it had not misrepresented anything, (b) the plans were themselves accurate, and (c) under the contract, any missing information with respect to construction joints was to be obtained from the architects. As the court stated in *Wiechmann, supra*:

"A careless contractor cannot convert his own lack of diligence into a case of fraudulent concealment against a public entity. As said in *Wunderlich* v. *State of California* (1967) 65 Cal.2d 777, 785 [56 Cal.Rptr. 473, 423 P.2d 545]: ' "All the information the State had concerning the soil conditions was available to claimant and claimant had been invited to make an investigation of its own. Under these circumstances, the State is not chargeable for claimant's loss. . . ." '

"The State of California is not the guardian of every contractor who seeks to perform services for the public and at public expense. Such a concept would be grossly unfair to the prudent and careful contractor who is frequently underbid by a careless competitor. A contractor who submits a bid for public work which proves unprofitable because of his negligence in failing to ascertain all the facts concerning it from sources readily available, cannot thereafter throw the burden of his negligence upon the shoulders of the state by asserting that the latter was guilty of fraudulent concealment in not furnishing him with information which he made no effort to secure for himself. This is particularly true when the careless contractor is possessed of the kind of knowledge which would concededly prompt a prudent bidder to make further inquiry." (31 Cal.App.3d at p. 753.)

It is evident from the foregoing that the instructions on implied warranty went far beyond the state of existing law and improperly omitted the crucial elements of misrepresentation and reasonable reliance.

■ The test for whether error in instructions requires reversal of the judgment was set forth by the California Supreme Court in the following language: "Generally speaking if it appears that error in giving an improper instruction was likely to mislead the jury and thus to become a factor in its verdict, it is prejudicial and ground for reversal. (4 Witkin, Cal. Procedure (2d ed. 1971) pp. 3056-3057.) To put it another way, "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court 'should not speculate upon the basis of the verdict.' " (*Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929]; . . ." (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353].) ■ The probability that the misleading instructions on implied warranty contributed significantly to the verdict of the jury is readily deducible: the jury returned with a verdict of nearly three-quarters of a million dollars against Foothill while the architects were held liable for only $25,000. Since Jasper's concrete claim against Foothill alone amounted to $500,000, such a verdict would indicate that the jury believed that the plans and specifications with respect to the method of concrete pouring were adequate for the job (i.e., the architects were not negligent), but that Foothill was held liable on the claim because the plans were "incomplete" in not specifically identifying the location of construction joints or the method of pouring to be used. The prejudicial nature of the instruction is apparent.

*Liquidated Damage Instruction*

■ Another major error in the instructions was that which informed the jury: "If you find that *any* delay on the project was caused by Defendant Foothill or its agents, then Defendant Foothill may not withhold any liquidated delay damages from Plaintiff Jasper, and you may not apportion the liquidated delay damages between these parties." (Italics added.) This was coupled with an instruction which informed them that if Jasper proved by a preponderance of the evidence that Foothill was responsible for "some of the delay" that prevented completion of the project within the official time, then it was not entitled to any liquidated damages.

These instructions were based on the rules set forth in *Gogo* v. *L.A. etc. Flood Control Dist., supra,* 45 Cal.App.2d 334 and *Aetna Cas. etc. Co.* v. *Bd. of Trustees* (1963) 223 Cal.App.2d 337 [35 Cal.Rptr. 765], both of which held that where both parties are responsible for delay of the

project, the court will not attempt to apportion the delay, but the entire liquidated damages clause will be unenforceable. In each of these cases, however, and in *United States* v. *United Engineering & Contracting Co.* (1913) 234 U.S. 236 [58 L.Ed. 1294, 34 S.Ct. 843], cited by Jasper, the contract did not evince an intent that liquidated damages could be assessed even where delay was caused by both parties. Thus, in *Robinson* v. *United States* (1922) 261 U.S. 486 [67 L.Ed. 760, 43 S.Ct. 420], the U.S. Supreme Court held that a liquidated damage provision was unaffected by the fact that the government was partially at fault for the delay, where the provision clearly stated that the contractor should pay "$420 for each and every day's delay *not caused by the United States.*" (Italics added.)

In *Nomellini Constr. Co.* v. *State of California* ex rel. *Dept. of Wat. Resources* (1971) 19 Cal.App.3d 240 [96 Cal.Rptr. 682], the court followed the *Robinson* rule and held that the trial court was obligated to apportion the delays between the state and a contractor and to enforce a liquidated damage provision. The court also quoted from 5 Williston on Contracts (3d ed. 1961) pages 764-766, which states that where a building contract contains provisions for extensions of time from the owner, the effect of owner-caused delay will operate merely as an extension of time and the builder will still be liable in liquidated damages for delay caused on his own part. (*Id.,* at pp. 245-246.)

In the present case, the contract between Jasper and Foothill not only contained provisions for extensions of time by the owner, but specifically provided that liquidated damages would be assessed for "every calendar day that the Contractor shall not be charged with liquidated damages . . . when the delay in completion of the work is due: . . . (b) To unforeseeable cause beyond the control and without the fault or negligence of the Contractor, including . . . *acts of the Owner.* . . ." (Italics added.)

It is clear that the present case called for the application of the apportionment rule set forth in *Nomellini* and *Robinson, supra.* This is true both because the contract contained an explicit provision allowing apportionment and because the "all or none" rule of *Gogo* and *Aetna* is based upon the principle that liquidated damages are disfavored by the law. The principle does not apply to public contracts, in which provisions for liquidated damages are expressly authorized by statute. (*Nomellini, supra,* 19 Cal.App.3d at p. 246; see Gov. Code, §§ 14376, 53069.85.)

Jasper's contention that apportionment would unnecessarily compli-
cate the fact finding process is fully answered by the following statement
from *Nomellini*: ". . . [C]ategorical statements that where delays are
caused on both sides there is no way to 'apportion damages' are an
absurdity. Damages are not being apportioned. Damages are liquidated.
Quantum of delay in terms of time is all that is being apportioned. That is
an uncomplicated fact finding process. That is what courts are for." (19
Cal.App.3d at p. 246.) It is noteworthy that under the instructions given
below, the jury was required to ascertain quantum of delay anyway, in
order to determine the amount of actual damages Foothill was entitled to
recover from Jasper. Application of the liquidated damages clause would
thus have in fact *simplified* their task. The fact that the figure which they
eventually arrived at was exceedingly low given the state of the evidence,
is strong evidence that Foothill was prejudiced by the instructions given.

*Admissibility of Buric's Testimony*

One of the main issues at trial was whether Jasper's concrete
claim was fabricated by him in an attempt to recoup losses which he had
incurred on the project through careless underbidding. Although there
existed extensive minutes of regular meetings between Jasper and the
architects, and numerous diaries and reports of the project were kept by
Jasper and others, no record of any complaint about concrete appears
until November 10, 1969, or three days after the concrete work was
completed.[2]

In support of its impeachment of Jasper's credibility, the defense
offered the testimony of Robert Buric, a consultant for B & L Construc-
tion Management Services. Jasper testified that he never heard of Buric,
but upon being shown a letter from Buric to Jasper, recalled that his
former attorney may have hired the B & L firm. In an *in camera* hearing,
Buric testified that in December 1970, Jasper contacted him requesting
that he look into Jasper's records to see if B & L could develop a claim
for damages as the result of a change in the scope of the work on the
auditorium; that Jasper eventually hired him at the rate of $20 per hour;
that Buric made a thorough investigation of Jasper's records, the contract
documents and other materials; that he met with Jasper on five different
occasions; that in January of 1971 he met with Jasper and his attorney to

---

[2]Jasper claimed that the concrete work was only "about three quarters through" on
November 10, but his own expert testified that it had been completed three days prior
thereto.

report his findings that although there was a large cost overrun in concrete, there was nothing in the records which would support a changed condition; that Jasper simply told Buric he wasn't needed any longer; and that Jasper thereafter refused to speak with Buric or pay him for his services.

Over vigorous objections of counsel for Foothill and the architects, the trial court refused to permit Buric to testify to anything except the fact that Jasper phoned him in December 1970, and that he met with Jasper five times, the fifth being in the presence of Jasper's attorney. The court ruled that the remainder of Buric's testimony was inadmissible under the "work product privilege." In the court's words: ". . . I do think that the courts have indicated quite clearly that an attorney has the right to prepare his case and to call in experts to consult with him and as long as they don't go beyond the consulting, that the other side can't get at them." This ruling was erroneous.

■ In the first place, a claim of "work product" is not available to prevent the testimony of an expert witness *at the time of trial.* (*Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 857 [139 Cal.Rptr. 888].) The work product privilege is not one of those enumerated in the Evidence Code and provisions as to work product found in Code of Civil Procedure section 2016 are in the nature of limitations on pretrial discovery. (*Brokopp, supra*; *Mize* v. *Atchison, T. & S.F. Ry. Co.* (1975) 46 Cal.App.3d 436, 448-449 [120 Cal.Rptr. 787].) The purpose of the doctrine is to prevent incompetent counsel from taking unfair advantage of his adversary's efforts in preparation for trial, not to suppress relevant testimony which happened to have been obtained by the opposition. (See Code Civ. Proc., § 2016, subds. (b), (g); Jefferson, Cal. Evidence Benchbook, § 41.1, pp. 704-705.)

■ Moreover, the trial court ruled that the work product rule applied even though Jasper himself hired Buric long before the filing of any lawsuit. This is not the law. (7) As stated in *Wilson* v. *Superior Court* (1964) 226 Cal.App.2d 715, 724 [38 Cal.Rptr. 255]: "Whatever the extent of the concept of an attorney's work product may be, it is clear that, given the broadest possible definition, it is still the *attorney's* work, or that of his agents or employees, that is involved, and the attorney cannot, by retroactive adoption, convert the independent work of another, already performed, into his own." ■ Similarly here, the

fact that Buric may have reported his findings and conclusions to Jasper's attorney could not retroactively confer "work product" status upon them.

■ Finally, Code of Civil Procedure section 2016, subdivision (b) provides that an attorney's work product shall not be discoverable "unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing his claim or defense or will result in an injustice . . . ." This provision requires that a court weigh carefully the power of impeachment as a valuable tool in the process of truth ascertainment against the benefits of protecting the privilege of "work product." (*Brown* v. *Superior Court* (1963) 218 Cal.App.2d 430, 443 [32 Cal.Rptr. 527].) ■ Given the potentially crucial effect that Buric's testimony would have had upon Jasper's credibility and the lack of any benefits to Jasper other than the suppression of damaging testimony, the trial court abused its discretion in determining that the work product privilege should prevail.

Jasper makes an elaborate argument that the content of Buric's testimony would have been privileged as a confidential communication between attorney and client. This contention is baseless. Buric was plainly not an intermediary for communication between Jasper and his attorney. The trial court found that Jasper himself hired Buric. The fact that Buric's findings were communicated to the attorney is irrelevant. " '[A] litigant cannot silence a witness by having him reveal his knowledge to the litigant's attorney.' " (*Grand Lake Drive In* v. *Superior Court* (1960) 179 Cal.App.2d 122, 127 [3 Cal.Rptr. 621, 86 A.L.R.2d 129], quoting from *City & County of S. F.* v. *Superior Court* (1951) 37 Cal.2d 227, 238 [231 P.2d 26, 25 A.L.R.2d 1418]; see also *People* ex rel. *Dept. Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 355 [19 Cal.Rptr. 473, 369 P.2d 1].)

Finally, Jasper proposes that the exclusion of Buric's testimony was not prejudicial to Foothill, since the entire substance of Buric's findings was before the jury in the form of other expert testimony. But the real importance of Buric's testimony was not his conclusions. It went to the vital issue of Jasper's credibility—was Jasper's concrete claim a genuine grievance which he continually complained about (as he claimed), or was it a hastily concocted theory which he used to "invent" a lawsuit?

Counsel for Jasper fully exploited the trial court's ruling in his closing argument to the jury.

Buric's findings and conclusions, the reasons he was hired and Jasper's statements and conduct toward Buric were all admissible and highly relevant. The deprivation of this critical impeachment evidence made it reasonably probable that a verdict more favorable to Foothill would have resulted in the absence of this error.

We therefore conclude that errors of substantial magnitude were committed which were prejudicial to Foothill and resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)

The judgment is reversed. Jasper's cross-appeal is dismissed.

Caldecott, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied April 18, 1979, and the opinion was modified to read as printed above. The petition of the plaintiff and appellant for a hearing by the Supreme Court was denied May 30, 1979.