163 Cal.App.4th 944 (2008)
LOS ANGELES UNIFIED SCHOOL DISTRICT, Plaintiff and Respondent,
v.
GREAT AMERICAN INSURANCE COMPANY et al., Defendants and Appellants.
No. B189133.
Court of Appeals of California, Second District, Division Two.
June 5, 2008.
*947 Wilson Elser Moskowitz Edelman & Dicker, John J. Immordino and Susannah M. Dudley for Defendant and Appellant Great American Insurance Company.
Monteleone & McCrory, Joseph A. Miller and Leighton T. Brown II for Defendant and Appellant Hayward Construction Company, Inc.
Bergman & Dacey, Inc., Gregory M. Bergman, John P. Dacey and Jorge J. Luna for Plaintiff and Respondent.

OPINION
CHAVEZ, J.
In this consolidated appeal, defendants and appellants Hayward Construction Company, Inc. (Hayward), and Great American Insurance Company (Great American) (collectively, appellants) appeal from a final judgment entered after the trial court granted a motion for summary adjudication and motion for judgment on the pleadings in favor of plaintiff and respondent Los Angeles Unified School District (District), and entered dispositive rulings in favor of the District on remaining legal issues. Appellants also appeal from the trial court's award of attorney fees. We reverse the judgment and reverse the attorney fee award.

FACTUAL BACKGROUND

1. The Project

The Queen Anne Place school project (the project) involved construction of a new elementary school in Los Angeles. In March 1996, following competitive bids required by law, the District contracted with Lewis Jorge Construction Management, Inc. (Lewis Jorge), to construct the project for approximately $10.1 million. By late 1998, the District became dissatisfied with Lewis *948 Jorge, and on February 9, 1999, the District declared Lewis Jorge to be in material breach and default. At that time, Lewis Jorge claimed it had completed work totaling $9.4 million, or approximately 93 percent of the original contract price.[1]
On April 27, 1999, the District's governing board adopted a declaration of emergency pursuant to Public Contract Code section 20113,[2] which allowed the District to enter into a contract to complete the project without advertising for or inviting bids. The District then sought completion cost proposals from other general contractors. Completion of the project required correction of certain work performed by Lewis Jorge. To assist potential contractors, the District created a "pre-punch list" that identified the remaining work and work to be corrected. The District received cost estimates from three general contractors, including Hayward, and ultimately selected Hayward to complete the project.

2. The Completion Agreement Between Hayward and the District

In June 1999, Hayward and the District entered into a completion contract for the project (completion agreement). Paragraph 8 of the completion agreement states that the contract "can be generally described as `a cost plus percentage fee (10%) with a guaranteed maximum,'" pursuant to which the District agreed to pay Hayward for cost of work, labor, and actual costs, plus a fee of 10 percent calculated as a markup on the actual costs incurred. Paragraph 11 states: "Contractor guarantees that the maximum amount payable by the District for the Cost of the Work plus the Contractor's Fee described in Paragraph 10 will not exceed Four Million Five Hundred Thousand Dollars ($4,500,000.00)."
In paragraph 15, the parties agreed that the scope of Hayward's work included the items listed on the pre-punch list. That paragraph states: "The Contractor's obligation to complete the work in accordance with this Completion Agreement and the Contract Documents shall include the responsibility to correct deficiencies in the work performed by the former contractor, without limitation, as noted on the current correction list issued by the District."
The "correction list" referred to in this paragraph consists of a 22-page pre-punch list prepared by the District's architect, and an 86-page pre-punch list prepared by the District's inspectors. The final entry on the architect's pre-punch list states: "Corrections or comments made in regard to the *949 pre-punch list during this review do not relieve the Contractor from compliance with the requirements of the drawings and specifications. This review is only for General Conformance with the design concept of this project and general compliance with the information given in the Contract Documents. The Contractor is responsible for confirming all quantities, dimensions and techniques of construction; coordinating all work with that of all other trades and performing his work in a safe, acceptable and satisfactory manner."
Each page of the pre-punch list prepared by the District's inspectors contains the following caption: "This is a courtesy pre-punch list and should not be taken as a final inspection punch list. This is not the punch list of minor corrective items made at the final inspection."
After Hayward and the District executed the completion agreement, Great American issued a performance bond for $4.5 million that guaranteed Hayward's performance of the contract.

3. Hayward's Work and the District's Advance of Sums Exceeding $4.5 Million

Not long after Hayward commenced work, a dispute arose between Hayward and the District concerning work that was not listed in either of the pre-punch lists. This work included correcting defects in the stucco work and subsurface defects in the bathroom tile work. In December 1999, Hayward advised the District that many unforeseen conditions made it necessary to increase the contract price beyond $4.5 million. In May 2000, the board of education allocated $3 million to complete the project. After the board's action, the District issued a purchase order for $2 million to complete the project. Payment was made to Hayward under an express reservation of rights, which stated that "the advancing of costs to [Hayward is] without prejudice to all of the District's rights to recover the monies advanced against all responsible parties, including [Hayward] and its surety company if appropriate."
In early February 2001, the parties met to discuss the payments. On February 16, 2001, the District wrote Hayward a letter explaining the District's position that cost of the work in excess of $4.5 million, plus certain change orders, were Hayward's contractual responsibility. The District demanded that Hayward and its surety, Great American, return more than $1 million the District paid to Hayward over and above the $4.5 million contract price. Hayward and Great American refused, and in March 2001 the District commenced this action.

*950 PROCEDURAL BACKGROUND

1. The Complaint

The District's complaint alleged breach of contract, breach of performance bond, and declaratory relief. The District sought a declaration that the completion agreement required Hayward to "complete construction of the Queen Anne Place Elementary School Project, including all deficiencies existing in the Project at the time [Hayward] commenced work thereat whether such deficiencies were latent or patent," and that Hayward "agreed to so perform, all for the guaranteed maximum price payable by the District of $4,500,000.00." Hayward and Great American filed answers to the complaint, and Hayward cross-complained for breach of contract, rescission, and declaratory relief.[3]

2. The District's Motion for Summary Adjudication

In June 2003, the District moved for summary adjudication on the issue of contract interpretation. Specifically, the District sought a ruling that Hayward was contractually obligated to complete all work on the project, including all deficiency corrections, for a guaranteed maximum cost of $4.5 million. In opposition, Hayward argued that triable issues of material fact precluded summary adjudication of this issue and that the completion agreement was ambiguous as to the scope of Hayward's obligation to correct deficient work. Hayward proffered extrinsic evidence to support its position and argued that the trial court was required to consider this evidence on a provisional basis before determining whether or not the contract was ambiguous. The District objected to Hayward's evidence as "inadmissible extrinsic evidence being presented to vary, alter and/or add to the terms of an integrated written instrument in violation of California law." The trial court agreed with the District, and on August 29, 2003, issued a minute order sustaining the District's objections to evidence in support of Hayward's opposition to the summary adjudication motion. Without indicating whether or not it had given provisional consideration to Hayward's evidence, the trial court concluded that "[t]he contract is not ambiguous." The trial court then granted the District's motion for summary adjudication on the issue of contract interpretation, concluding: "Hayward had a duty under the contract to complete the project by performing all work in conformance with the Completion Agreement and the Contract Documents including the responsibility to correct deficiencies in the work performed by the former contractors without limitation as note[d] on the then-current correction list issued by the District. In the *951 contract each of the parties contracted for certain risks in exchange for certain benefits. Hayward was required to do the work for an amount not to exceed $4.5 million."

3. The District's Motion to Bifurcate Legal Issues and Motion for Judgment on the Pleadings

In September 2003, the District moved to bifurcate trial on six legal issues, and the trial court granted the District's request to try two of these issues: (1) whether contract modifications were required to be in writing, approved by the District's board, and signed by both parties; and (2) whether District field representatives had legal authority to modify the contract.
The District also filed a motion for judgment on the pleadings relating to Hayward's rescission and declaratory relief claims. In its motion, the District argued that the completion agreement was a contract awarded pursuant to statutory competitive bidding requirements and could not be set aside as a matter of law. The District maintained that the completion agreement was a continuation of the competitively bid Lewis Jorge contract, which was never extinguished, but which had been "transitioned" to Hayward pursuant to article 16 of the Lewis Jorge contract.[4]
In January 2004, the trial court granted the District's motion for judgment on the pleadings, relying on California case law holding that a contractor may not abandon a public contract and seek recovery under equitable remedies, because public works contracts may only be made under prescribed modes. (See Amelco Electric v. City of Thousand Oaks (2002) 27 Cal.4th 228 [115 Cal.Rptr.2d 900, 38 P.3d 1120] (Amelco).) The trial court stated: "Hayward is subject to a public contract which arose initially by competitive bidding. It was altered and modified as required by Public Contract Code Section 7105(d)(2) through Article 16[5] as well as Public Contract Code Section 20113. This transition does not exempt it from Public Contract Code Section 7105(d)(2).[6] *952 Neither Hayward nor the Court can, therefore, rescind the contract to invoke some form of equitable recovery."
On the two bifurcated legal issues, the trial court concluded "that all change orders for payment for extra work must be in writing and signed by the parties," and "that all change orders for extra work must be in writing and approved by [the District]." It also concluded that "the field representative[s] of the District did not have the authority to alter, amend, modify and/ or change in any way the Completion Agreement and the Contract Documents." The trial court then invited briefing on the question of whether or not there were any writings which conform to paragraph 16 of the completion agreement obligating the District to pay more than the $4.5 million plus executed change orders.
Hayward identified a purchase order which it claimed obligated the District to pay more than $4.5 million. On March 3, 2004, the trial court ruled against Hayward, finding, among other things, that the purchase order did not bind the parties because it was not signed. The trial court then concluded that the District "was only obligated to pay the $4.5 million contract price plus executed change orders." In its March 3, 2004 minute order, the trial court requested briefing by the parties identifying any remaining legal issues.

4. The Remaining Issues

In response to the trial court's March 3, 2004 order, the District submitted briefs on four legal issues: (1) whether Hayward was obligated to repay the District $1,144,738.15 in funds advanced over and above the $4.5 million contract price; (2) whether Great American was jointly and severally obligated to repay the $1,144,738.15; (3) whether Hayward's claims for interest, penalties, and attorney fees were no longer viable; and (4) whether Hayward's breach of contract cause of action based on misrepresentation was no longer viable. The District maintained that these issues could be decided as a matter of law, in light of the trial court's previous rulings on the District's motion for summary adjudication and motion for judgment on the pleadings. Hayward argued that the trial court's prior rulings were erroneous and that unresolved factual issues precluded the trial court from deciding, as a matter of law, the issues identified by the District.
Great American joined in Hayward's arguments and claimed the right to assert all of Hayward's affirmative defenses. Great American also identified the following remaining legal issues relating to the District's claim on the *953 performance bond: (1) whether Hayward completed the projected and corrective work noted on the punch list for $4.5 million, thereby exonerating Great American's obligation on the performance bond; (2) whether the work performed by Hayward over the $4.5 million was outside the scope of the contract; (3) whether Great American is liable under the terms of the performance bond for sums paid by the District in excess of $4.5 million; (4) whether, in light of the trial court's ruling on the District's motion for summary adjudication that the contract was not ambiguous, Hayward's obligations under the completion agreement were limited to patent defects pursuant to paragraph 13 of that agreement; and (5) what preclusive effect, if any, the consent of surety had on Great American's defenses.
On May 19, 2004, the trial court ruled that Hayward could not maintain a cause of action for breach of contract based on misrepresentation, because "Hayward's recitation of the facts does not contain any showing that any omissions were actively concealed or that material information was intentionally omitted by" the District. The trial court further determined that Great American was jointly and severally obligated to repay amounts owed by Hayward to the District. The court stated: "The issues raised by Great American regarding Hayward's obligations have been previously decided. Great American's performance bond is a broad form bond obligating it jointly and severally with Hayward to repay the [D]istrict the monies it overpaid Hayward under its reservation of rights." The trial court then ordered Hayward and the District to file briefs "setting forth any remaining legal issues."
In response, Hayward briefed two issues: (1) whether or not the District breached implied warranties that the plans and specifications were complete, accurate, and free from defects; and (2) whether the District breached the implied covenant of good faith and fair dealing. On September 1, 2004, the trial court ruled against Hayward on these two issues. The parties agreed to meet and confer and to file a joint statement on the remaining legal issues.
The parties agreed that certain issues involved factual questions to be presented to a jury at trial.[7] The parties also agreed that issues relating to the District's entitlement to prejudgment interest, attorney fees and costs should be resolved through posttrial motions. The parties were unable to reach agreement on a joint statement, however, and submitted separate briefs on the remaining legal issues.
*954 In its brief, the District argued that several of Hayward's and Great American's affirmative defenses to the District's claim for repayment of $1,144,738.15 were based on undisputed facts that had been presented previously to and considered by the trial court in ruling on the District's motion for summary adjudication and motion for judgment on the pleadings. The District maintained that unless Hayward or Great American presented new facts supporting those affirmative defenses, the trial court's prior rulings were dispositive as a matter of law.
Hayward contended that issues remained concerning several of its affirmative defenses. Great American joined in Hayward's contentions and, in addition, claimed the following of its own affirmative defenses remained for trial: waiver, estoppel and unclean hands; fraud, misrepresentation and concealment; District's breach of contract and contract terms; mistake; mitigation of damages; fault of others; no proximate cause; and failure of conditions.

5. The November 10, 2004 Hearing

A hearing on the remaining legal issues was held on November 10, 2004. The minute order for that hearing states: "As to Hayward's and Great America[n]'s request for trial on the affirmative defenses to [the District's] breach of contract action, this Court has previously ruled. These issues were previously raised or could have been raised prior to the Court's rulings as reflected in the minute orders of August 29, 2003, January 14, 2004 and March 3, 2004." On November 19, 2004, Great American filed an exception to the trial court's November 10, 2004 ruling, claiming that the issues on the affirmative defenses were never determined, or were erroneously determined, in prior hearings and rulings, and that Great American had been denied due process because the trial court's November 10, 2004 ruling was without notice or opportunity to be heard.
At a status conference on September 2, 2005, the trial court granted Great American leave to file a motion for an order determining that the completion agreement was legally invalid because the District's emergency declaration pursuant to section 20113 was inadequate. Great American filed its brief in support of this motion on October 14, 2005. On October 14, 2005, Great American also filed a request for clarification on the trial court's ruling granting the District's motion for summary adjudication.
On November 22, 2005, the trial court stated that its ruling granting the District's motion for summary adjudication was based on both the District's emergency declaration pursuant to section 20113 and the trial court's determination that the completion agreement was not a separate contract but a continuation of the competitively bid Lewis Jorge contract. The trial court *955 also concluded that the completion agreement was not illegal but "was validly let and modified pursuant to Public Contract Code § 710[5](d)(2) and Article 16 of the Lewis Jorge Contract as well as Public Contract Code § 20113, the emergency declaration statute."
A judgment in the amount of $1,133,696.38 ($1,144,738.15, less an offset of $11,041.77 pursuant to a stipulation of the parties), was entered against Hayward and Great American, jointly and severally. Prejudgment interest on the sum of $1,144,738.15 was also awarded to the District. Judgment was also entered in favor of the District on all causes of action asserted in Hayward's cross-complaint.
After entry of judgment, the District moved for its attorney fees and costs pursuant to section 7107. On April 4, 2006, the trial court granted the motion and awarded the District $849,354, jointly and severally against Hayward and the District.
This appeal followed.

CONTENTIONS
Hayward contends (1) the trial court erred in granting the District's motion for summary adjudication concerning the scope of Hayward's obligation under the completion agreement because the trial court failed to consider credible extrinsic evidence to determine if the contract is reasonably susceptible to Hayward's interpretation; (2) the trial court erred by concluding, as a matter of law, that the completion agreement could be modified by only one method and that, because this method was not followed, Hayward was precluded from pursuing a claim for extra work; (3) the trial court improperly granted the District's motion for judgment on the pleadings on the ground that Hayward could not maintain a cause of action for rescission; (4) the trial court erroneously concluded that Hayward could not sustain a breach of contract claim against the District based on the theory of implied warranty; and (5) the trial court erred by denying Hayward a right to trial of factual issues including alleged misrepresentations by the District. Hayward further contends that, because the underlying judgment must be reversed, the postjudgment fee award must also be reversed.
Great American adopts all of Hayward's contentions. In addition, Great American contends (1) the trial court erred by concluding as a matter of law that Great American was jointly and severally liable with Hayward to repay to the District sums paid to Hayward over and above the $4.5 million contract price; (2) the trial court erred in determining that the completion agreement was legal and enforceable; and (3) the trial court erred in denying Great *956 American a jury trial on its affirmative defenses. Great American further contends the trial court erroneously concluded that Great American was jointly and severally obligated to pay the District's attorney fees under the terms of the performance bond; the amount of attorney fees awarded to the District was excessive; and, because the underlying judgment must be reversed, the attorney fee award must also be reversed.

DISCUSSION

I. Hayward's Contentions

A. Summary Adjudication of Contract Interpretation

1. Standard of Review

The standard of review for an order granting or denying a motion for summary adjudication is de novo. (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The trial court's stated reasons for granting summary adjudication are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale. (Kids' Universe v. In2labs (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].)
The trial court's determination of whether or not a contract provision is ambiguous is a question of law, subject to de novo review on appeal. (Wolf v. Superior Court (2004) 114 Cal.App.4th 1343, 1351 [8 Cal.Rptr.3d 649].) The trial court's resolution of an ambiguity is also a question of law if no extrinsic evidence is admitted to interpret the contract or if the extrinsic evidence is not in conflict. (Ibid.)

2. Extrinsic Evidence

Hayward and Great American contend the trial court committed reversible error by not considering, on a provisional basis, extrinsic evidence proffered in support of Hayward's interpretation of the completion agreement. The trial court concluded that the parol evidence rule excluded such evidence because it was being offered to alter, vary, or add to the terms of an integrated contract.
*957 (1) The parol evidence rule is codified at Civil Code section 1625[8] and Code of Civil Procedure section 1856.[9] It "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument. [Citations.]" (Alling v. Universal Mfg. Corp. (1992) 5 Cal.App.4th 1412, 1433 [7 Cal.Rptr.2d 718].) The parol evidence rule does not, however, prohibit the introduction of extrinsic evidence "to explain the meaning of a written contract ... [if] the meaning urged is one to which the written contract terms are reasonably susceptible. [Citation.]" (BMW of North America, Inc. v. New Motor Vehicle Bd. (1984) 162 Cal.App.3d 980, 990-991, fn. 4 [209 Cal.Rptr. 50].)
(2) "`Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. [Citations.] ... [I]t is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face.'" (Wolf v. Superior Court, supra, 114 Cal.App.4th at pp. 1350-1351.)
The decision whether to admit extrinsic evidence "`involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the *958 language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second stepinterpreting the contract. [Citation.]'" (ASP Properties Group, L.P. v. Fard, Inc. (2005) 133 Cal.App.4th 1257, 1267 [35 Cal.Rptr.3d 343], quoting Winet v. Price (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].) "`"When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is `reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over. [Citation.] ..."' [Citation.]" (People ex rel. Lockyer v. R.J. Reynolds Tobacco Co. (2003) 107 Cal.App.4th 516, 524 [132 Cal.Rptr.2d 151], quoting Oceanside 84, Ltd. v. Fidelity Federal Bank (1997) 56 Cal.App.4th 1441, 1448 [66 Cal.Rptr.2d 487].)
The extrinsic evidence proffered by Hayward and rejected by the trial court included the declaration and deposition testimony of Toby Hayward, an officer of Hayward, and the deposition testimony of a Hayward employee named Jeff Bahr. In his deposition testimony, Mr. Hayward stated that during initial contract negotiations with the District, he discussed with District representatives the scope of Hayward's obligation to correct defective work performed by the previous contractor and expressed the view that Hayward's responsibility was limited to items listed on the pre-punch list. Mr. Hayward further testified that District representatives told him during initial meetings that Hayward would not be required to tear apart walls to view underlying conditions to determine whether they were constructed in accordance with the plans and specifications. Mr. Bahr testified that when Hayward encountered certain defects in the tilework early on during the project, District representatives Mike Merritt and Steve Olshan stated that correcting those defects was outside the scope of Hayward's work because they were not listed on the pre-punch list.
(3) The record does not indicate whether the trial court provisionally considered this extrinsic evidence before concluding that the contract was not ambiguous. The trial court did not expressly find that paragraph 15 of the contract was not reasonably susceptible to Hayward's interpretation. We cannot conclude, on the basis of the record before us, that it is not so susceptible.
The contract language itself is not so clear and explicit that it is unambiguous on its face. It states that Hayward's obligation to complete the work "shall include the responsibility to correct deficiencies in the work performed by the former contractor, without limitation, as noted on the current correction list issued by the District." Hayward contends that the phrase "as noted on the current correction list issued by the District" refers to Hayward's "responsibility to correct deficiencies in the work performed by the former contractor." The District maintains that the phrase "as noted on the current *959 correction list issued by the District" unambiguously refers to the two words immediately preceding it"without limitation." The "current correction list" mentioned in paragraph 15, however, does not state that Hayward's obligation to correct defective work performed by the previous contractor was "without limitation" and encompassed both patent and latent defects. The architect's pre-punch list contains the general disclaimer that the items listed therein are the result of a review "only for General Conformance with the design concept of this project and general compliance with the information given in the Contract Documents." It further states that "[c]orrections or comments made in regard to the pre-punch list during this review do not relieve the Contractor from compliance with the requirements of the drawings and specifications." The District inspectors' pre-punch list states that "[t]his is a courtesy pre-punch list and should not be taken as a final inspection punch list. This is not the punch list of minor corrective items made at the final inspection. The following corrections and omissions are noted to prevent their being overlooked and should not be construed to be the punch list of minor corrective items made at the final inspection." Neither document states that Hayward's obligation to correct defective work included latent as well as patent defects in the work performed by the previous contractor.
We reverse the trial court's order granting summary adjudication in the District's favor and remand the matter for the trial court to consider extrinsic evidence relevant to interpretation of the contract. Because the trial court, on remand, will determine the scope and extent of Hayward's contractual obligation to correct defective work performed by the previous contractor, we need not, at this juncture, address Hayward's argument as to whether the contract was or could be modified to allow payment for additional work.

B. Motion for Judgment on the Pleadings

1. Standard of Review

"A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action. [Citation.] A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review. [Citations.] All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law; judicially noticeable matters may be considered. [Citations.]" (Kapsimallis v. Allstate Ins. Co. (2002) 104 Cal.App.4th 667, 672 [128 Cal.Rptr.2d 358].) Further, the court reviews the complaint liberally, giving it a reasonable interpretation, reading it as a whole and its parts in their context. (Code Civ. Proc., § 452; Fiol v. Doellstedt (1996) 50 Cal.App.4th 1318, 1323 [58 Cal.Rptr.2d 308].)

*960 2. Trial Court's Ruling and the Parties' Contentions

The trial court granted the District's motion for judgment on the pleadings as to the third, fourth, and fifth causes of action for rescission and declaratory relief in Hayward's cross-complaint[10] on the grounds that the completion agreement was "a public contract which arose initially by competitive bidding" subject to section 7105, subdivision (d)(2), and that "[n]either Hayward nor the Court can, therefore, rescind the contract to invoke some form of equitable recovery." Hayward contends the trial court's decision was erroneous because it adjudicated matters beyond those pleaded in the cross-complaint, and because, as a matter of law, the remedy of rescission is available when a public entity's misrepresentation and concealment of material information constitute a breach of contract.
The District contends that section 7105, subdivision (d)(2) applies, because the completion agreement was not a separate contract, but merely a continuation of the Lewis Jorge contract, which had been competitively bid pursuant to section 20111. The District claims that it "transitioned" the Lewis Jorge contract to Hayward pursuant to article 16 of that contract, which accorded the District the right, in the event of a contractor default, to "complete the contract by whatever method the District may deem expedient."[11] The District maintains that its emergency declaration under section 20113 was simply an independent basis for transferring the contract from Lewis Jorge to Hayward. As support for its argument, the District relies on the common law doctrine known as the continuing contract exception. (See, e.g., Shore v. Central Contra Costa Sanitary Dist. (1962) 208 Cal.App.2d 465 [25 Cal.Rptr. 419] (Shore); and Garvey School Dist. v. Paul (1920) 50 Cal.App. 75 [194 P. 711] (Garvey).)

*961 3. Applicable Law

a. Sections 20111 and 20113

Section 20111 requires school districts to award contracts for public projects by competitive bidding. Subdivision (b) of that statute provides in part: "The governing board shall let any contract for a public project ... involving an expenditure of fifteen thousand dollars ($15,000) or more, to the lowest responsible bidder who shall give security as the board requires, or else reject all bids."
(4) The competitive bidding requirements of section 20111 do not apply to all public projects. (1 Acret et al., Cal. Construction Contracts and Disputes (3d ed. 2006) § 4.14, p. 353.) Section 20113 excepts from competitive bidding requirements certain contracts entered into in emergency situations: "In an emergency when any repairs, alterations, work, or improvement is necessary to any facility of public schools to permit the continuance of existing school classes, or to avoid danger to life or property, the board may, by unanimous vote, with the approval of the county superintendent of schools, ... [¶] ... [m]ake a contract in writing or otherwise on behalf of the district for the performance of labor and furnishing of materials or supplies for the purpose without advertising for or inviting bids." (§ 20113, subd. (a)(1).)

b. Section 7105, Subdivision (d)

Section 7105, subdivision (d), governs the termination, amendment, and modification of contracts entered into by public agencies. Subdivision (d)(1) of that statute states: "Where authority to contract is vested in any public agency, excluding the state, the authority shall include the power, by mutual consent of the contracting parties, to terminate, amend, or modify any contract within the scope of such authority." Section 7105, subdivision (d)(2) states that subdivision (d)(1) of the statute does not apply to contracts that are subject to competitive bidding requirements: "Paragraph (1) shall not apply to contracts entered into pursuant to any statute expressly requiring that contracts be let or awarded on the basis of competitive bids. Contracts of public agencies, excluding the state, required to be let or awarded on the basis of competitive bids pursuant to any statute may be terminated, amended, or modified only if the termination, amendment, or modification is so provided in the contract or is authorized under provision of law other than this subdivision. The compensation payable, if any, for amendments and modifications shall be determined as provided in the contract." (§ 7105, subd. (d)(2).)

*962 4. Section 7105, Subdivision (d)(2) Does Not Apply

Section 7105, subdivision (d)(2), by its terms, applies to public contracts "required to be let or awarded on the basis of competitive bids pursuant to any statute." The parties do not dispute that the completion agreement was not entered into pursuant to statutory competitive bidding requirements. Section 7105, subdivision (d)(2) accordingly does not apply.
The District's contention that its contract with Hayward was not a separate contract, but merely a continuation of the competitively bid Lewis Jorge contract, is not supported by the record. Before entering into the completion agreement, the District's board of education adopted a declaration of emergency under section 20113, authorizing the District to enter into contracts for the completion of the project without competitive bidding. The completion agreement itself refers to that emergency declaration. It makes no reference to article 16 of the Lewis Jorge contract, the provision now invoked by the District as the means for transferring the Lewis Jorge contract to Hayward. Although the completion agreement incorporates the terms and conditions of the Lewis Jorge contract, it does not state that it is a continuation of, or transfer of the Lewis Jorge contract, nor has the District provided any evidence of the parties' intent to do so.
(5) The continuing contract exception, on which the District relies as the basis for claiming the completion contract was subject to competitive bidding requirements, is inapplicable. The continuing contract exception is a common law doctrine courts have applied to uphold the validity of a contract entered into by a public agency without complying with statutory notice and competitive bidding requirements in certain emergency situations. For example, in Garvey, supra, 50 Cal.App. 75, the court determined that a school district could, without publishing notice for competitive bids, enter into contracts necessary to complete a project initially undertaken by a contractor to whom the work had been awarded by competitive bid. The court reasoned that competitive bids were not necessary because the initial contract had not been abandoned, and the school district "was proceeding in accordance with the terms of a contract still in existence, which had been let according to law, and which by its terms provided for the then existing emergency." (Id. at pp. 79-80.) In Shore, supra, 208 Cal.App.2d 465, the continuing contract exception was applied to uphold the validity of a contract let by a county sanitation district to complete a sewer project left unfinished by a defaulting contractor. The court in Shore reasoned that the subsequent contract was "a mere continuation of [the county's] existing, and admittedly legal, contract" with the previous contractor. (Id. at p. 469.)
Garvey and Shore are inapposite. Neither case addressed rescission of a public contract under section 7105, subdivision (d). Moreover, both Garvey *963 and Shore predate the enactment of section 20113, which excepts contracts entered into by a school district in emergency circumstances from the statutory competitive bidding requirements relied upon by the District in this case. (Added by Stats. 1982, ch. 465, § 11, pp. 1914-1915; derivation: Ed. Code, former § 39648, enacted by Stats. 1976, ch. 1010, § 2, pp. 2384, 3197; Ed. Code (1959), former § 15956, enacted by Stats. 1959, ch. 2, § 3, pp. 596, 1095; Ed. Code (1943), former § 18056, enacted by Stats. 1943, ch. 71, pp. 310, 661; former School Code (1929), § 6.35; former Pol. Code (1927), § 1612, enacted by Stats. 1927, ch. 109, § 1, p. 204.)[12] The continuing contract exception does not support the conclusion that the completion agreement was a competitively bid contract subject to section 7105, subdivision (d)(2). The trial court erred by concluding that section 7105, subdivision (d)(2) bars Hayward's rescission causes of action as a matter of law.

5. Amelco Does Not Bar Hayward's Rescission Claims

The District contends that Amelco, supra, 27 Cal.4th 228 bars Hayward's rescission causes of action. That case, however, is inapposite. Amelco concerned a contractor's claim to set aside a public works contract awarded pursuant to competitive bid on the theory that the parties had abandoned the contract's change order process, and to recover in quantum meruit for the actual cost of the project. The court in Amelco concluded that "allowing contractors to recover in quantum meruit for the actual as opposed to the bid cost of a project would encourage contractors to bid unrealistically low, with the hope of prevailing on an abandonment claim ...," and would be "fundamentally inconsistent with the purpose of the competitive bidding statutes." (Id. at pp. 240, 239.)
The completion agreement at issue here was not entered into pursuant to the competitive bidding statutes, nor is Hayward seeking to recover its actual costs under an abandonment theory of liability. The court in Amelco did not hold that rescission claims may never be asserted against a public entity, or that a contractor may never recover for extra work caused by a breach of contract. Amelco accordingly does not bar the rescission causes of action asserted in Hayward's cross-complaint.
We reverse the trial court's order granting the District's motion for judgment on the pleadings as to the causes of action for rescission and declaratory relief in Hayward's cross-complaint.

*964 C. Hayward's Misrepresentation/Breach of Implied Warranty Claims

The trial court concluded that Hayward could not maintain a cross-action for breach of contract based on misrepresentation or nondisclosure of material facts because "Hayward's recitation of the facts does not contain any showing that any omissions were actively concealed or that material information was intentionally omitted by the [District]." Citing Jasper Construction, Inc. v. Foothill Junior College Dist. (1979) 91 Cal.App.3d 1, 10 [153 Cal.Rptr. 767] (Jasper), the trial court stated that "[a] breach of contract action for misrepresentation or non-disclosure against a public entity must involve an affirmative misrepresentation or an intentional non-disclosure." The trial court further noted that Hayward admitted in deposition that it neither possesses nor is aware of any evidence of such affirmative misrepresentation or intentional concealment.
(6) There is a conflict in authority as to whether a contractor must prove intentional concealment by the public agency in order to recover on a claim for nondisclosure of material facts. (Compare Jasper, supra, 91 Cal.App.3d at p. 10 and Thompson Pacific Construction, Inc. v. City of Sunnyvale (2007) 155 Cal.App.4th 525, 551 [66 Cal.Rptr.3d 175] (Thompson) with Welch v. State of California (1983) 139 Cal.App.3d 546, 556 [188 Cal.Rptr. 726] (Welch); see also 1 Acret et al., Cal. Construction Contracts and Disputes, supra, § 4.55, p. 393.) The First and Sixth District Courts of Appeal have concluded that a showing of intentional concealment is necessary. In Jasper, supra, 91 Cal.App.3d at page 10, the First Appellate District stated that "there must be an affirmative misrepresentation or concealment of material facts in the plans and specifications in order for the contractor to recover ..." on a breach of implied warranty claim. The Sixth Appellate District is in accord: "In order to recover on such an action, the contractor must prove that the agency affirmatively misrepresented, or actively concealed, material facts which rendered the bid documents misleading...." (Thompson, supra, 155 Cal.App.4th at p. 551.) Both courts reasoned that affirmative misrepresentation or concealment is required "to avoid burdening public entities `with liability where the contractor underbids due to lack of diligence in examining specifications and plans which are themselves accurate.' [Citation.]" (Thompson, supra, at p. 551, quoting Japser, supra, at p. 10.)
The Third District Court of Appeal, on the other hand, has rejected a requirement of affirmative misrepresentation or active concealment. In Welch, supra, 139 Cal.App.3d 546, the trial court concluded that a state agency was not liable for misrepresentation or nondisclosure in an action by a public works contractor because the contractor failed to prove that the agency actively and intentionally concealed information concerning site conditions that significantly increased the cost of repairing an underwater pier. The Third *965 District reversed the judgment, reasoning as follows: "It is well established that, in a tort context, the `supression of a fact by one ... who gives information of other facts which are likely to mislead for want of communication of that fact ...' is actionable. [Citations.] In such context, there is no requirement of proving an affirmative fraudulent intent to conceal. [Citation.] The same premise applies logically to public construction contracts where liability is based on breach of an implied warranty instead of a tort theory. [Citation.] Hence, the State had a legal duty to disclose ... information if to do so would have eliminated or materially qualified the misleading effect of the misrepresentation...." (Id. at p. 556.)
One authority has suggested that this conflict in the case law "can perhaps be reconciled by" the following "careful elucidation": "Nondisclosure of a material fact is itself an affirmative act sufficient to constitute active misrepresentation." (1 Acret et al., Cal. Construction Contracts and Disputes, supra, § 4.55, p. 393.) The same authority notes, however, that "[i]f this reasoning is not persuasive, Welch appears to be the better authority. Jasper appears to be contrary to the weight of authority across the United States, at least insofar as it limits liability to instances of positive misrepresentation." (Ibid.)
We agree that the standard set forth in Welch is the better one and apply that standard here. Hayward may maintain a cross-action for breach of contract based on nondisclosure of material information if it can establish that the District knew material facts concerning the project that would affect Hayward's bid or performance and failed to disclose those facts to Hayward. We therefore reverse the trial court's ruling that Hayward cannot, as a matter of law, maintain a cross-action against the District for breach of contract based on breach of implied warranty.

II. Great American's Contentions

A. Joint and Several Liability for Sums Exceeding $4.5 Million

(7) Great American contends the trial court erred by concluding that the terms of the performance bond obligated Great American "jointly and severally with Hayward to repay the [D]istrict the monies it overpaid Hayward under its reservation of rights."[13] Great American's liability under the terms of its performance bond is dependent upon Hayward's liability *966 under the terms of the completion agreement. (Cypress v. New Amsterdam Casualty Co. (1968) 259 Cal.App.2d 219, 225 [66 Cal.Rptr. 357]; Civ. Code, § 2809 [liability of a surety is coextensive with that of the principal].) Because we reverse the order summarily adjudicating the scope of Hayward's obligation under the completion agreement, and its liability to the District for amounts paid in excess of $4.5 million, we also reverse the order determining that Great American is jointly and severally obligated with Hayward to repay such sums to the District.

B. Legality of Completion Contract

Great American contends the trial court incorrectly ruled that the completion agreement was not illegal. Whether a contract is illegal is a question of law subject to de novo review. (Kashani v. Tsann Kuen China Enterprise Co. (2004) 118 Cal.App.4th 531, 540 [13 Cal.Rptr.3d 174].)
(8) The trial court offered two independent bases for its ruling on the legality of the completion agreement, which was not awarded pursuant to statutory competitive bidding requirementsthe District's emergency declaration under section 20113, and the trial court's determination that the completion agreement was not a separate contract but a continuation of the Lewis Jorge contract. We hold that the District's emergency declaration pursuant to section 20113 was a valid and sufficient basis for excepting the completion agreement from the statutory competitive bidding requirements and affirm the trial court's ruling. As discussed, section 20113 excepts from statutory competitive bidding requirements certain contracts entered into in the event of an "emergency."[14] The term "emergency," as used in section 20113, is defined in section 1102 as follows: "`Emergency,' as used in this code, means a sudden, unexpected occurrence that poses a clear and imminent danger, requiring immediate action to prevent or mitigate the loss or impairment of life, health, property, or essential public services." (§ 1102; Marshall v. Pasadena Unified School Dist. (2004) 119 Cal.App.4th 1241, 1254-1256 [15 Cal.Rptr.3d 344] (Marshall).) "[G]iven the strong public policy favoring competitive bidding, the emergency exception thereto should be strictly construed and restricted to circumstances which truly satisfy the statutory criteria." (Marshall, at p. 1256.)
Great American contends that the trial court erred, as a matter of law, by concluding that the completion agreement was a valid emergency contract *967 entered into pursuant to section 20113, and that the court should have afforded Great American the opportunity to have a jury determine the factual issue of whether an emergency existed within the meaning of the statute. The pertinent facts, as stated in the District's emergency declaration, are undisputed. In light of the undisputed facts, the trial court could properly determine, as a matter of law, whether an emergency existed within the meaning of section 20113. (Save the Sunset Strip Coalition v. City of West Hollywood (2001) 87 Cal.App.4th 1172, 1179 [105 Cal.Rptr.2d 172] [court considers the proper construction of a statute and its application to undisputed facts as a matter of law].)
The District's emergency declaration states in relevant part: "The new facilities being constructed for Queen Anne Elementary School were near completion when the general contractor walked off the job and was subsequently defaulted by the District on February 9, 1999. The project is approximately 93 percent complete. District representatives are currently working with the defaulted contractor's surety to obtain an agreement on completing the project. In the meantime, the facility stands empty and is a target for vandalism and deterioration. The District could take over the project and complete it in the quickest possible time by declaring an emergency. This would provide the best chance to protect our facility."
The facts stated in the District's emergency declaration meet the statutory definition of an "emergency." The cessation of work on the project by Lewis Jorge, the District's initial contractor, was sudden and unexpected, requiring immediate action on the part of the District to prevent damage or deterioration to the partially completed facility and to mitigate the impairment of an essential public servicenamely, public school classes. Marshall, supra, 119 Cal.App.4th 1241, on which Great American relies in support of its argument that no valid emergency existed, is distinguishable. In that case, the Pasadena Unified School District exercised its contractual right to terminate, for the district's own convenience, a construction contract entered into with a prior contractor. The school district then issued an emergency declaration authorizing the award of a separate contract, without complying with statutory bidding requirements, to another contractor. The court in Marshall determined that the school district's decision to terminate the contract for its own convenience "did not come close to meeting" the statutory standard for an emergency. (Id. at p. 1258.) Here, in contrast, the District's emergency declaration was precipitated by Lewis Jorge's abandonment of the project and the need to protect the unfinished facility.
We affirm the trial court's ruling that the completion agreement was not illegal.

*968 III. Contentions of Both Hayward and Great American

A. Affirmative Defenses

Both Hayward and Great American appeal the trial court's November 10, 2004 order denying their respective requests for trial on the affirmative defenses to the District's breach of contract action. The trial court denied the request on the ground that "[t]hese issues were previously raised or could have been raised prior to the ... rulings ... reflected in the minute orders of August 29, 2003, January 14, 2004 and March 3, 2004." Because we reverse the rulings reflected in those orders, we also reverse the order dismissing the relevant affirmative defenses.

B. Attorney Fees

Hayward and Great American both appeal the award of attorney fees to the District as the prevailing party under section 7107, subdivision (f). Because we reverse the underlying judgment, we also reverse the attorney fee award.

DISPOSITION
We reverse the order granting the District's motion for summary adjudication on the issue of contract interpretation. We remand the matter to the trial court to consider extrinsic evidence relevant to interpretation of the contract and to determine the scope and extent of Hayward's contractual obligations in light of any admissible extrinsic evidence.
We reverse the order granting the District's motion for judgment on the pleadings and barring Hayward's causes of action for rescission.
We reverse the order precluding Hayward from maintaining, as a matter of law, a cross-action for breach of contract based on misrepresentation or nondisclosure of material facts.
We reverse the order concluding that Great American is jointly and severally obligated with Hayward to repay the District sums paid in excess of $4.5 million.
We affirm the order determining that the completion agreement was not illegal.
We reverse the order dismissing Hayward's and Great American's affirmative defenses.
*969 We reverse the attorney fee award.
The parties will bear their respective costs on appeal.
Boren, P. J., and Doi Todd, J., concurred.
NOTES
[1] The default precipitated a lawsuit among the District, Lewis Jorge, and various subcontractors, which was resolved by settlement in 2003.
[2] All further statutory references are to the Public Contract Code, unless otherwise stated.
[3] The action was consolidated with a related action, Mobley v. Lewis Jorge Construction Management, Inc., case No. BC193087, which subsequently settled.
[4] Article 16 of the Lewis Jorge contract provides in part: "If, in the opinion of the District, the Contractor at any time during the progress of the work refuses or neglects to supply a sufficiency of material and labor, or fails to perform any provision of this contract, including safety requirements, the District may without prejudice to any other remedy do any or all of the following: (1) make good such deficiencies or complete the contract by whatever method the District may deem expedient, and the cost and expense thereof shall be deducted from the contract amount; (2) initiate default procedures; and (3) initiate procedures to declare the Contractor a nonresponsible bidder for a period of from two to five years."
[5] Although unclear, the reference to "Article 16" appears to be to the default provisions set forth in article 16 of the Lewis Jorge contract, and not to paragraph 16 of the completion agreement, which governs contract modifications and changes.
[6] Section 7105, subdivision (d)(2) provides, in part that contracts of public agencies "required to be let or awarded on the basis of competitive bids pursuant to any statute may be ... modified only if the ... modification is so provided in the contract or is authorized under provision of law other than this subdivision."
[7] These issues concerned the District's claim on Hayward's license bond, the District's claims with regard to the HVAC system and the grass field, Hayward's claim for interest on allegedly late progress payments, and the dates of the checks issued for the $1,144,738.15 advanced by the District.
[8] Civil Code section 1625 provides: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."
[9] Code of Civil Procedure section 1856 states: "(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. [¶] (b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement. [¶] (c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance. [¶] (d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement. [¶] (e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue. [¶] (f) Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue. [¶] (g) This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in [Code of Civil Procedure] Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud. [¶] (h) As used in this section, the term agreement includes deeds and wills, as well as contracts between parties."
[10] The third and fourth causes of action in Hayward's cross-complaint seek rescission of the completion agreement, "restoration of the benefits of performance provided by the parties and other appropriate restitutionary relief," based on the District's alleged concealment of material information concerning the scope of work and contract price, and on Hayward's allegedly mistaken belief concerning the scope of work. The fifth cause of action seeks a declaration that the completion agreement "should be rescinded and restitution of the value of each parties' performance ordered."
[11] Article 16 of the Lewis Jorge contract provides in relevant part: "If, in the opinion of the District, the Contractor at any time during the progress of the work refuses or neglects to supply a sufficiency of material and labor, or fails to perform any provision of this contract, including safety requirements, the District may without prejudice to any other remedy do any or all of the following: (1) make good such deficiencies or complete the contract by whatever method the District may deem expedient, and the cost and expense thereof shall be deducted from the contract amount; (2) initiate default procedures; and (3) initiate procedures to declare the Contractor a nonresponsible bidder for a period of from two to five years."
[12] Moreover, because the contracting agency in Shore was a county sanitation district, and not a school district, the statutory provisions governing emergency contracts for school facilities in effect at that time (1959) (Ed. Code, former § 15956, from which § 20113 was derived), would not have applied.
[13] In a January 14, 2004 minute order denying Great American's motion for judgment on the pleadings, the trial court had previously ruled that the performance bond was a "`broad forum' performance bond for prompt and faithful performance of all terms and conditions of the contract." In its January 14, 2004 order, the trial court noted that "[t]here is an ongoing dispute as to whether or not Hayward complied with the terms and conditions of the contract; that is, did they complete the work for $4.5 million dollars."
[14] Section 20113, subdivision (a)(1), provides: "In an emergency when any repairs, alterations, work, or improvement is necessary to any facility of public schools to permit the continuance of existing school classes, or to avoid danger to life or property, the board may, by unanimous vote, with the approval of the county superintendent of schools, ... [¶] ... [m]ake a contract in writing or otherwise on behalf of the district for the performance of labor and furnishing of materials or supplies for the purpose without advertising for or inviting bids."